UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
MATTHEW CORSO,

        Plaintiff,

        - against -

CITY OF NEW YORK, JOSE CALLE-PALOMEQUE,
and JANE DOE #1,

        Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

17 Civ. 6096 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Matthew Corso sues defendants Jose Calle-Palomeque and Jane Doe #1, officers of the New York City Police Department (NYPD), under 42 U.S.C. § 1983. Corso asserts that his constitutional rights were violated when Calle-Palomeque and Doe stopped him in the 14th Street-Union Square station of the New York City Subway and that those rights were further violated over the course of a resulting search, arrest, and criminal prosecution. Corso also seeks to hold the City of New York liable for these alleged violations under the municipal liability doctrine set forth in Monell v. Department of Social Services, 436 U.S. 658 (1978). Defendants move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss for failure to state a claim. As we will explain, the motion is granted in part and denied in part.

## I.  Background

We recite the facts as presented in the complaint, which we must accept as true for purposes of deciding this motion.  See Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015).

At around 2:00 p.m. on February 24, 2016, plaintiff Matthew Corso exited an L train onto the platform at 14th Street-Union Square in the New York City Subway, Compl. ¶ 19, where he was stopped by defendant Jose Calle-Palomeque and an unidentified NYPD officer, defendant Jane Doe #1 (collectively, the "officers"), Compl. ¶ 20.  The officers asserted that they had observed a black metal clip clipped to Corso's rear pants pocket, Compl. ¶ 25,[1] and proceeded to remove a knife from Corso's right rear pocket, Compl. ¶ 24.

This knife was "a model number CK5TBS Smith & Wesson-branded knife manufactured by Taylor Brands LLC that Mr. Corso uses for work"[2] and is a "folding knife, with a 3.25-inch blade, and 4.13-inch handle."  Compl. ¶¶ 28-29.  The knife blade "locks into the handle using a 'liner lock', and can only be released from the handle by unlocking the blade and then manually pushing the blade out of the handle using the thumb knobs."  Compl. ¶ 29.  The blade "cannot readily be opened by the force of gravity or centrifugal force."  Compl. ¶ 30.  Taylor Brands, through its president, has

---

[1] The complaint is silent as to whether the knife clip had in fact been visible.

[2] The complaint is also silent as to any specifics regarding Corso's job.

disclaimed that the company manufactures any knives that could be characterized as gravity knives. Compl. ¶ 31.

Corso was arrested for possession of a gravity knife[3] over his protestations that the knife was not a gravity knife and despite the officers' failed attempts to open the knife using gravity or centrifugal force.[4] Compl. ¶¶ 32-33. The officers then transported Corso to a police precinct, where he was placed and cuffed on a bench. Compl. ¶¶ 35-36. At the precinct, Calle-Palomeque "repeatedly and forcefully manipulated" the knife "in an attempt to loosen the blade." Compl. ¶ 37.

The officers "then spoke with the New York County District Attorneys' [sic] Office," informing the office that Corso had violated both section 265.01(1) of the Penal Law and section 1050.8 of the New York City Transit Rules of Conduct, N.Y. Comp. Codes R. & Regs. tit. 21, § 1050.8.[5] Compl. ¶ 38. The District Attorney's

---

[3] Section 265.01(1) of the New York Penal Law criminalizes the possession of "any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or 'Kung Fu star.'" N.Y. Penal Law § 265.01(1). Section 265.00(5) in turn defines "gravity knife" to be "any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device." Id. § 265.00(5).

[4] "To determine whether a knife is a gravity knife, police officers and prosecutors 'us[e] the force of a one-handed flick-of-the-wrist to determine whether a knife will open from a closed position,' a method known as the wrist-flick test." Copeland v. Vance, 893 F.3d 101, 108 (2d Cir. 2018) (alteration in original) (quoting Copeland v. Vance, 230 F. Supp. 3d 232, 238 (S.D.N.Y. 2017)).

[5] Section 1050.8 of the Transit Rules of Conduct provides in relevant part that: "No weapon, dangerous instrument, or any other item intended for use as a weapon may be carried in or on any facility or conveyance [of the New York City Transit Authority]."

Office sent the officers a Criminal Complaint, which the officers then reviewed, signed, and returned to the District Attorney's Office -- despite knowing that the allegations it contained were false. Compl. ¶¶ 39-42. The District Attorney's Office then issued legal process against Corso. Compl. ¶ 43. The officers subsequently "forwarded false evidence" to the District Attorney's Office, including certain "arrest reports; complaint reports; evidence vouchers; the manipulated and damaged knife; the fabricated Criminal Court Complaint; and property vouchers." Compl. ¶ 44.

The complaint's factual allegations as to Corso end there. Whether Corso was criminally prosecuted is not set forth in the complaint, and what transpired during any criminal proceedings (to the extent they were commenced) and how those proceedings were resolved are also unexplained. Rather, the complaint alleges only in conclusory fashion that "Corso suffered damage as a result of Defendants' actions" in that he was "deprived of liberty, [and] suffered emotional distress, mental anguish, fear, anxiety, embarrassment, humiliation, and damage to reputation." Compl. ¶ 45.

Corso filed suit on August 13, 2017. His complaint asserts six causes of action: (1) unlawful stop and search; (2) false arrest; (3) denial of the right to a fair trial; (4) malicious abuse of process; (5) failure to intervene; and (6) municipal

liability under <u>Monell</u>.  Defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.  Discussion

In order to withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>  While we "accept[] as true all factual allegations in the complaint, and draw[] all reasonable inferences in the plaintiff's favor," <u>Barrows</u>, 777 F.3d at 111, we "are not bound to accept as true a legal conclusion couched as a factual allegation," <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Brown v. Daikin Am., Inc.</u>, 756 F.3d 219, 225 (2d Cir. 2014) (quoting <u>Iqbal</u>, 556 U.S. at 678).  Applying these standards, we consider in turn the six claims that Corso asserts.

### A.  Unlawful Stop and Search (Claim 1)

"[P]olice officers may in 'appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no

probable cause to make an arrest.'" Dancy v. McGinley, 843 F.3d 93, 106 (2d Cir. 2016) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)). "To justify a Terry stop, the officer must have reasonable suspicion -- a reasonable basis to think that the person to be detained is committing or has committed a criminal offense." Id. (internal quotation marks omitted). The reasonable suspicion "standard takes into account the totality of the circumstances -- the whole picture. Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Navarette v. California, 572 U.S. 393, 397 (2014) (citations and internal quotation marks omitted). Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing." United States v. Singletary, 798 F.3d 55, 59 (2d Cir. 2015). In making this assessment, we "view the totality of the circumstances through the eyes of a reasonable and cautious police officer on the scene, whose insights are necessarily guided by his experience and training." Id. at 60.

The viability of Corso's unlawful stop and search claim depends on whether the officers had reasonable suspicion to stop

Corso.[6] Defendants argue that the officers did, based on the fact

that they observed a knife clip on Corso's rear pants pocket.

Compl. ¶ 25. Contrary to defendants' characterization, however,

the complaint does not allege that a knife clip was visible on

Corso's person. Rather, the complaint alleges only that the

officers "would later allege that they predicated their stop and

search on the fact that they observed Mr. Corso with a black metal

clip clipped to his rear, right-side pants pocket." Compl. ¶ 25

(emphasis added). That is, the complaint contains no factual

allegations as to whether a knife clip had in fact been visible on

Corso's person, and the parties' arguments regarding reasonable

suspicion and qualified immunity are therefore difficult to

---

[6] We reject at the outset plaintiffs' argument that defendants are
collaterally estopped (i.e., barred based on issue preclusion) from litigating
the issue of reasonable suspicion here based on Clay v. City of New York, No.
14 Civ. 9171 (RMB), 2016 WL 5115497 (S.D.N.Y. Sept. 9, 2016). "Federal
principles of collateral estoppel, which we apply to establish the preclusive
effect of a prior federal judgment, require that (1) the identical issue was
raised in a previous proceeding; (2) the issue was actually litigated and
decided in the previous proceeding; (3) the party had a full and fair opportunity
to litigate the issue; and (4) the resolution of the issue was necessary to
support a valid and final judgment on the merits." Ball v. A.O. Smith Corp.,
451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted). "With issue
preclusion, it is the prior judgment that matters, not the court's opinion
explaining the judgment." 18 Moore's Federal Practice § 132.03[4][a] (3d ed.
2015); see also 18A Charles A. Wright et al., Federal Practice & Procedure
§ 4427 (2d ed.) (Westlaw 2018) ("Judicial actions must achieve a basic minimum
quality to become eligible for res judicata effects [defined to include both
issue and claim preclusion]. First, there must be a judgment.").
    The opinion in Clay related to two plaintiffs, one of whom dismissed his
case by stipulation and the other of whom continues to litigate his case.
Because no judgment necessarily deciding the issue of reasonable suspicion has
been entered, and because preclusive effect in turn flows from a valid and final
judgment (and not merely a judicial order or opinion) necessarily deciding the
issue, Corso's appeals to collateral estoppel are wholly unpersuasive and border
on the frivolous.

definitively assess on this Rule 12(b)(6) motion. Accordingly, defendants' motion is denied as to this claim.

Nonetheless, acknowledging "the importance of resolving immunity questions at the earliest possible stage in litigation," Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam), we take this opportunity to express deep skepticism as to the viability of this claim if a knife clip had in fact been visible, as the individual defendants would almost certainly be entitled to qualified immunity on this claim.[7] "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.'" Kass v. City of New York, 864 F.3d 200, 206 (2d Cir. 2017) (quoting Zalaski v. City of Hartford, 723 F.3d 382, 389 (2d Cir. 2013)). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in a defendant's position should know about the

---

[7] By contrast, an officer who _ex post_ fabricates the visibility of a knife clip as a pretext for a stop would _not_ be entitled to qualified immunity.

constitutionality of the conduct." <u>Young v. County of Fulton</u>, 160 F.3d 899, 903 (2d Cir. 1998).

When a defendant invokes qualified immunity, "courts engage in a two-part inquiry: [1] whether the facts [alleged] 'make out a violation of a constitutional right,' and [2] 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" <u>Taravella v. Town of Wolcott</u>, 599 F.3d 129, 133 (2d Cir. 2010) (quoting <u>Pearson</u>, 555 U.S. at 232). While considering the two steps sequentially "is often appropriate," nonetheless we may exercise "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." <u>Pearson</u>, 555 U.S. at 236.

If a knife clip had in fact been visible on Corso's person, Corso will have identified no clearly established right that was violated. Corso purports to identify a clearly established right in "[t]he right to be free from unreasonable seizures by law enforcement" [Opp'n at 18], but this characterization operates at far too high a level of generality. <u>See, e.g.</u>, <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1152 (2018) (per curiam) ("[The Supreme Court] has repeatedly told courts . . . not to define clearly established law at a high level of generality." (internal quotation marks omitted)); <u>White v. Pauly</u>, 137 S. Ct. 548, 552 (2017) (per curiam) ("Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a

high level of generality." (internal quotation marks omitted)).
As the Supreme Court has explained, "[i]t could plausibly be
asserted that any violation of the Fourth Amendment is 'clearly
established,' since it is clearly established that the protections
of the Fourth Amendment apply to the actions of police," but "the
right allegedly violated must be defined at the appropriate level
of specificity before a court can determine if it was clearly
established." Wilson v. Layne, 526 U.S. 603, 615 (1999). "The
general proposition, for example, that an unreasonable search or
seizure violates the Fourth Amendment is of little help in
determining whether the violative nature of particular conduct is
clearly established." Ashcroft v. al-Kidd, 563 U.S. 731, 742
(2011).

Though "general statements of the law are not inherently
incapable of giving fair and clear warning to officers," White,
137 S. Ct. at 552 (internal quotation marks omitted), the qualified
immunity analysis must focus on "the specific context of the case,"
Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Brosseau v.
Haugen, 543 U.S. 194, 198 (2004) (per curiam)). "[S]uch
specificity is especially important in the Fourth Amendment
context, where the Court has recognized that '[i]t is sometimes
difficult for an officer to determine how the relevant legal
doctrine, here excessive force, will apply to the factual situation
the officer confronts.'" Id. (alteration in original) (quoting

<u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001)). "[C]learly established law must be 'particularized' to the facts of the case." <u>White</u>, 137 S. Ct. at 552 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).[8]

Accordingly, the specific right of relevance here is not, as Corso suggests, the right to be free from unreasonable searches and seizures broadly. Rather, it is the right not to be stopped and searched by police based only on a visible knife clip. This right was not clearly established on February 24, 2016, the date Corso was stopped, <u>see</u> Compl. ¶ 19. Corso identifies a number of authorities that he asserts clearly establish this right for qualified immunity purposes: <u>United States v. Irizarry</u>, 509 F. Supp. 2d 198 (E.D.N.Y. 2007), <u>Merring v. Town of Tuxedo</u>, No. 07 Civ. 10381 (CS), 2009 WL 849752 (S.D.N.Y. Mar. 31, 2009), <u>Clay v. City of New York</u>, No. 14 Civ. 9171 (RMB), 2016 WL 5115497 (S.D.N.Y. Sept. 9, 2016), and a number of state court cases. These authorities do not do so.

Corso's reliance on state court cases in contending that his right was clearly established is puzzling, given the vehemence with which he subsequently criticizes defendants' reliance on

---

[8] While much of the Supreme Court's recent qualified immunity jurisprudence has arisen in the context of excessive force, the reasonable suspicion analysis is no less fact-dependent and context-specific. <u>Compare, e.g.</u>, <u>Tennessee v. Garner</u>, 471 U.S. 1, 8-9 (1985) (excessive force analysis based on "the totality of the circumstances"), <u>with, e.g.</u>, <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981) ("the totality of the circumstances -- the whole picture -- must be taken into account" in analyzing reasonable suspicion).

state court cases. Having taken both positions on the propriety of considering state court cases, Corso is bound to be correct in one and only one of those positions; here, he correctly contends that the Second Circuit disapproved of analyzing state court cases in determining whether a right was clearly established. See, e.g., Wright v. Smith, 21 F.3d 496, 500 (2d Cir. 1994) (directing courts to consider "whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question");[9] cf. Charles W. v. Maul, 214 F.3d 350, 361 (2d Cir. 2000) ("In claiming the existence of a constitutional right, plaintiff may not exploit a lower state court opinion . . . as clearly establishing that right sufficient to deprive state officials, regardless of the level of their positions, of a qualified immunity defense.").

This principle, of course, vitiates any support provided by the litany of state court cases that Corso cites. Further, even if state court opinions were properly considered, New York state courts are hardly in agreement about the propriety of the type of stop and search to which Corso was subjected. Compare, e.g., People v. Cruz, 963 N.Y.S.2d 506, 510 (Sup. Ct. App. Term. 2013) (finding no reasonable suspicion to stop and search based on a

_____

[9] The Second Circuit, however, has sometimes considered case law from other courts of appeals in analyzing whether a right was clearly established. See Varrone v. Bilotti, 123 F.3d 75, 79 (2d Cir. 1997) (analyzing case law from the First, Fifth, and Eighth Circuits).

visible knife clip), with, e.g., People v. Cameron, 122 A.D.3d 472, 472 (1st Dep't 2014) (finding reasonable suspicion to stop and search based on a visible knife clip).  These disagreements, if anything, weigh heavily against the conclusion that Corso's right not to be stopped and searched based only on a visible knife clip was clearly established.  See Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 378-79 (2009) (analyzing the impact of "disuniform views of the law" on whether a right is clearly established).

Nor do the remaining authorities clearly establish the right in question.  The Second Circuit has squarely held that "a district court decision does not 'clearly establish' the law, even in its own circuit."  Richardson v. Selsky, 5 F.3d 616, 623 (2d Cir. 1993); see also Cerrone v. Brown, 246 F.3d 194, 202 (2d Cir. 2001) ("A district court opinion affirmed by an unpublished table decision does not determine whether a right was clearly established.").  The three district court opinions on which Corso relies therefore cannot clearly establish the right that he asserts was violated.[10]

---

[10] Corso places great reliance in particular on Clay, 2016 WL 5115497 -- incorporating almost verbatim large portions of Judge Berman's opinion into his complaint and motions papers [e.g., Compl. ¶ 26, Opp'n at 2-3].  This reliance is doubly misplaced.  The clearly established inquiry assesses conduct "against the backdrop of the law at the time of the conduct."  Kisela, 138 S. Ct. at 1152 (quoting Brosseau, 543 U.S. at 198).  Clay postdates Corso's stop and search by more than half a year, and thus cannot factor into the "clearly established" analysis for a second, wholly independent reason.

In sum, we cannot conclude that the individual defendants are entitled to a qualified immunity defense based on the factual allegations in the complaint.  Indeed, the absence of such allegations in Corso's complaint as to the presence or absence of a visible knife clip is notable.  Nonetheless, if the record comes to establish that a knife clip had in fact been visible on Corso's person when he was stopped, dismissal of his unlawful stop and search claim would almost certainly be warranted on the basis of qualified immunity.

**B.  False Arrest (Claim 2)**

"To state a claim for false arrest under New York law, a plaintiff must [allege] that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."  <u>Savino v. City of New York</u>, 331 F.3d 63, 75 (2d Cir. 2003) (internal quotation marks omitted).  "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity."  <u>Simpson v. City of New York</u>, 793 F.3d 259, 265 (2d Cir. 2015).

While the complaint is silent as to whether a knife clip was visible, it acknowledges that Corso did have a knife in his back pocket -- the CK5TBS folding knife with a 3.25-inch blade and 4.13-

14

inch handle.  Compl. ¶¶ 24, 28-29.  The first operative question, accordingly, is whether the discovery of this knife gave the officers probable cause to arrest Corso.[11]  Second, even if the officers lacked actual probable cause, qualified immunity applies if they had "arguable probable cause."  See Simpson, 793 F.3d at 268.

"An officer has probable cause to arrest when he has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003) (internal quotation marks omitted).  "In order to establish probable cause, it is not necessary to make a prima facie showing of criminal activity or to demonstrate that it is more probable than not that a crime has been or is being committed."  United States v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987) (internal quotation marks omitted); see also Williams v. City of New York, No. 05 Civ. 10230 (SAS), 2007 WL 2214390, at *5 (S.D.N.Y. July 26, 2007) (citing Cruz, 834 F.2d at 50); Sarnicola v. County of Westchester, 229 F. Supp. 2d 259, 266 (S.D.N.Y. 2002) (same).  Rather, "probable cause requires only the possibility of criminal activity or the possibility that evidence of a crime will be

_____

[11] The complaint's allegation that "Corso's arrest was without probable cause," Compl. ¶ 34, is, of course, insufficient because it is a legal conclusion rather than a factual allegation.

found." United States v. Zabala, 52 F. Supp. 2d 377, 382 (S.D.N.Y. 1999) (B.D. Parker, J.) (citing Texas v. Brown, 460 U.S. 730 (1983)); see also Williams, 2007 WL 2214390, at *5; Sarnicola, 229 F. Supp. 2d at 266. "[T]he question with which we are presented is not whether [the arrestees] were in fact guilty of violation of the New York statute, but rather whether there was probable cause to believe that they were." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 139 (2d Cir. 2010).

"When determining whether probable cause existed to support an arrest, we consider those facts available to the officer at the time of arrest and immediately before it, and we must render our decision based on the totality of the circumstances." Simpson, 793 F.3d at 265 (internal quotation marks omitted). "[O]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." Finigan v. Marshall, 574 F.3d 57, 63 (2d Cir. 2009) (quoting Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989)). An officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," Garcia v. Does, 779 F.3d 84, 93 (2d Cir. 2015) (internal quotation marks omitted), but "an officer may not disregard plainly

exculpatory evidence," Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006).

"While an officer need not have concrete proof of each element of a crime to establish probable cause for an arrest, probable cause means more than bare suspicion." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (citations and internal quotation marks omitted). "[N]o probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." United States v. Valentine, 539 F.3d 88, 94 (2d Cir. 2008).

However, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Devenpeck v. Alford, 543 U.S. 146, 153 (2004). Because "[a] Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each [specific] charge," a false arrest claim fails "if there was probable cause to arrest [plaintiff] for any single offense." Marcavage v. City of New York, 689 F.3d 98, 109-10 (2d Cir. 2012).

Further, the probable cause analysis here does not depend on the legitimacy of the initial stop. "The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant." Townes v.

City of New York, 176 F.3d 138, 149 (2d Cir. 1999); see also id. at 148 ("The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all."). Accordingly, "even if the officers lacked probable cause to search and seize evidence, once that evidence is seized, it can validly constitute probable cause to arrest." Guzman v. United States, No. 11 Civ. 5834 (JPO), 2013 WL 543343, at *5 (S.D.N.Y. Feb. 14, 2013).[12]

Finally, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Zalaski, 723 F.3d at 390 (quoting Escalera, 361 F.3d at 743). However, "[a]rguable probable cause should not be misunderstood to mean almost probable cause," and an officer is not entitled to qualified immunity "if no officer of reasonable competence could have made the same choice in similar

---

[12] For this reason, any damages that Corso could recover on his unlawful stop and search claim would be limited to the period between the initial stop and the discovery of the knife in his back pocket. See, e.g., Morgan v. City of New York, No. 12 Civ. 704 (WFK), 2014 WL 3407714, at *5 (E.D.N.Y. July 10, 2014).

circumstances." <u>Dancy</u>, 843 F.3d at 107 (internal quotation marks omitted). That is, "[i]f officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." <u>Jenkins v. City of New York</u>, 478 F.3d 76, 87 (2d Cir. 2007).

Defendants argue that Corso's possession of the knife is sufficient to establish probable cause to arrest for a violation of section 1050.8, which prohibits the carrying of any "weapon, dangerous instrument, or any other item intended for use as a weapon," N.Y. Comp. Codes R. & Regs. tit. 21, § 1050.8(a).[13] While section 1050.8 does not define "weapon" or "dangerous instrument," it does provide that "weapon or dangerous instrument shall include, <u>but not be limited to</u>, a firearm, switchblade knife, boxcutter, straight razor or razor blades that are not wrapped or enclosed in a protective covering, gravity knife, sword, shotgun or rifle." <u>Id.</u> Plaintiff responds that his knife was not a "switchblade, boxcuter [sic], straight razor or gravity knife, and, therefore, was not in violation of § 1050.8," and that, rather, his knife

---

[13] A violation of section 1050.8 is admittedly minor: it is punishable by "a fine not to exceed $25 or a term of imprisonment not longer than 10 days, or both." 21 N.Y. Comp. Codes R. & Regs. tit. 21, § 1050.10(a). But the relative triviality of section 1050.8 is irrelevant for Fourth Amendment purposes: a violation of section 1050.8 may be "subject to criminal prosecution in the criminal court of the City of New York," <u>id.</u>, and "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender," <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001).

"was completely legal within New York City" as it did not violate section 10-133(b) of the New York City Administrative Code [Opp'n at 11], which criminalizes the possession of "any knife which has a blade length of four inches or more," N.Y.C. Admin. Code § 10-133(b).

Plaintiff's arguments are flawed as a matter of logic and do not aid in our assessment of whether the officers had probable cause to arrest Corso based on the knife. Section 1050.8's use of "weapon or dangerous instrument" is not limited to the examples set forth in the text of the rule, and the fact that Corso's knife is not a switchblade, boxcutter, straight razor, or gravity knife does not mean that it could not otherwise qualify as a "weapon or dangerous instrument." Similarly, Corso's knife having a blade less than four inches establishes at most that it did not violate section 10-133(b) of the City Administrative Code; possession of such a knife could still violate some other statute or regulation.[14]

The "facts available to the officer at the time of arrest and immediately before it," Simpson, 793 F.3d at 265, are that Corso possessed, in the subway, a 4.13-inch knife with a 3.25-inch blade, Compl. ¶¶ 28-29. The complaint does not specify the timing of the officers' "attempt[s] to use gravity/centrifugal force to open the

---

[14] For example, section 1050.8 would appear to criminalize possession of a pen -- an innocuous, and otherwise entirely legal, item -- if the carrier intended to use it as a stabbing instrument rather than a writing instrument. See 21 N.Y. Comp. Codes R. & Regs. tit. 21, § 1050.8(a) (prohibiting the carrying of a "weapon, dangerous instrument, or any other item intended for use as a weapon" (emphasis added)).

20

knife," Compl. ¶ 33, but we assume in Corso's favor that these attempts occurred prior to his arrest. Accordingly, the officers also knew prior to Corso's arrest that the knife could not be opened using only gravity or centrifugal force.

Given these facts as alleged, we cannot conclude that the officers had probable cause to arrest for a violation of section 265.01 of the Penal Law: the officers' inability to open the knife using only gravity or centrifugal force is "plainly exculpatory evidence" that tends to vitiate probable cause as to section 265.01, Panetta, 460 F.3d at 395. The question remains, however, whether Corso's possession of a 4.13-inch knife with a 3.25-inch blade gave the officers probable cause to arrest for any other crime -- including a violation of section 1050.8 of the Transit Rules of Conduct.[15]

New York courts have not squarely interpreted section 1050.8 of the Transit Rules of Conduct and its use of the terms "weapon" and "dangerous instrument" in particular. Given this dearth of authority, a competent officer could reasonably believe, see Dancy, 843 F.3d at 107, that such a knife amounts to a "weapon" or "dangerous instrument" under section 1050.8 and therefore could

---

[15] We acknowledge that in Irizarry, Judge Weinstein in the Eastern District concluded that an officer lacked probable cause to arrest based on the arrestee's possession of a folding knife. 509 F. Supp. 2d at 209-10. However, Irizarry analyzed only section 265.01 of the Penal Law and not section 1050.8 of the Transit Rules of Conduct (though the events in question also occurred in the subway), and the knife at issue in Irizarry had "a one inch cutting edge," id. at 201, a far cry from the 3.25-inch blade alleged in the complaint, Compl. ¶ 28.

have made the same decision to arrest. For instance, given that the Penal Law generally defines "deadly weapon" to include "a switchblade knife, gravity knife, pilum ballistic knife, [or] metal knuckle knife," N.Y. Penal Law § 10.00(12) (emphasis added), an officer could reasonably conclude that section 1050.8's use of the term "weapon" -- without the "deadly" modifier -- encompasses a range of knives beyond those enumerated in the Penal Law's definition of a "deadly weapon." Cf. United States v. Diaz, 854 F.3d 197, 203 (2d Cir. 2017) ("'[T]he Fourth Amendment allows for some mistakes on the part of government officials,' including 'reasonable . . . mistakes of law.'" (omission in original) (quoting Heien v. North Carolina, 135 S. Ct. 530, 536 (2014))). That is, at minimum, we cannot conclude that "officers of reasonable competence would have to agree" that Corso's possession of a 4.13-inch knife with a 3.25-inch blade in the subway "did not add up to probable cause," Jenkins, 478 F.3d at 87, to arrest for a violation of section 1050.8 of the Transit Rules of Conduct.[16]

We therefore conclude that the individual defendants had, at minimum, arguable probable cause to arrest Corso, and that the

_____

[16] Similarly, an officer could reasonably conclude that the knife, which is longer than four inches in its closed position (even though the blade itself is less than four inches long), was a knife prohibited under section 10-133(a) of the City Administrative Code. Even though the officer would have been mistaken in so believing because the blade was 0.75 inches below the four-inch threshold, a reasonable mistake of fact of this type would imply that no Fourth Amendment violation occurred at all. See Stephenson v. Doe, 332 F.3d 68, 78 (2d Cir. 2003) ("[C]laims that an officer made a reasonable mistake of fact . . . go to the question of whether the plaintiff's constitutional rights were violated.").

complaint fails to state a false arrest claim as a result. Corso's false arrest claim is dismissed.

### C.  Denial of a Right to a Fair Trial (Claim 3)

"In order to [state] a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information, an arrestee must [allege] that [1] the officer created false information, [2] the officer forwarded the false information to prosecutors, [3] the false information was likely to influence a jury's decision," and [4] that he "suffer[ed] a deprivation of life, liberty, or property as a result." Garnett v. Undercover Officer C0039, 838 F.3d 265, 279–80 (2d Cir. 2016).

"Somewhat counterintuitively, a claim for denial of the right to a fair trial does not require that the underlying action actually proceeded to a trial on the merits." Polanco v. City of New York, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *11 (S.D.N.Y. Mar. 28, 2018) (citing, inter alia, Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129-30 (2d Cir. 1997)). The existence of probable cause is also not a defense to a fair trial claim. See Ricciuti, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee."). However, "if the initial arrest is lawful," a plaintiff must allege some "further deprivation of

liberty" that resulted "from the fabrication of evidence."
Garnett, 838 F.3d at 277; see Ganek v. Leibowitz, 874 F.3d 73, 91
(2d Cir. 2017).

The complaint's only allegation regarding any deprivation of
life, liberty, or property that Corso suffered is the cursory
allegation that "Corso was, inter alia, deprived of liberty,
suffered emotional distress, mental anguish, fear, anxiety,
embarrassment, humiliation, and damage to reputation." Compl.
¶ 45. This allegation is perhaps the epitome of a "legal
conclusion couched as a factual allegation," Iqbal, 556 U.S. at
678, as it contains no factual matter explaining how, exactly,
Corso was deprived of liberty. Corso argues, relying on a number
of authorities addressing deprivation of liberty in the malicious
prosecution context, in part that post-arraignment court
appearances or being subject to certain travel restrictions may
constitute a deprivation of liberty satisfying the fourth element
of a fair trial claim. Cf. Singer v. Fulton Cty. Sheriff, 63 F.3d
110, 117 (2d Cir. 1995). But even if this argument is correct as
a legal matter, Corso identifies nothing in the complaint alleging
that, as a factual matter, he was required to appear in court
following his arraignment (or, for that matter, that he was ever
arraigned in the first instance); all the complaint offers is a
threadbare recital of a necessary element of Corso's fair-trial
claim, see Brown, 756 F.3d at 225, that he was "deprived of

liberty," Compl. ¶ 45.[17]  This silence as to what occurred during

Corso's criminal prosecution -- assuming in Corso's favor, of

course, that it was ever undertaken -- and any deprivation of

liberty that might have occurred as a result mandates the dismissal

of Corso's fair trial claim.[18]  Corso will, however, be afforded

an opportunity to replead this claim to the extent he can do so

consistent with Rule 11 of the Federal Rules of Civil Procedure.

### D.  Malicious Abuse of Process (Claim 4)

"In New York, a malicious abuse-of-process claim lies against

a defendant who (1) employs regularly issued legal process to

compel performance or forbearance of some act (2) with intent to

---

[17] Corso's detention at the precinct following his arrest is a deprivation of liberty, but cannot sustain his fair-trial claim because it occurred before Calle-Palomeque allegedly manipulated the knife and passed false information to the District Attorney's Office.  See Compl. ¶¶ 36-37.

[18] Because the complaint contains no allegations identifying the specific deprivations of liberty to which Corso was subjected, we cannot assess the City's argument that no additional deprivation is attributable to Calle-Palomeque's modification of the knife.

We do, however, emphatically reject Corso's argument that we cannot take judicial notice of the Criminal Court Complaint.  Corso relies heavily on our earlier decision in Williams v. City of New York, No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *2 (S.D.N.Y. July 21, 2015), in which we declined to take judicial notice of "[an officer's] report of interviewing a complainant, an arrest record, the criminal complaint and indictment, and a deposition of plaintiff" for the truth of the matters asserted therein, reasoning that "it is not beyond dispute that the police report is a truthful description of the police officers' basis to arrest plaintiff," id.

At issue here is the legal effect of the criminal court complaint, a document to which Corso refers repeatedly throughout his complaint, alleging that it had the effect of causing him to be subject to prosecution (thereby forming the basis of his fair-trial and abuse-of-process claims), Compl. ¶¶ 40-41 (as distinguished from the truth of the matters asserted in a criminal court complaint in the context of a false-arrest claim as in Williams).  It is incorporated by reference, and we accordingly take judicial notice of the complaint in order to determine its contents and for its legally operative effect (that the officers asserted to the District Attorney's Office that Corso had violated both section 265.01 of the Penal Law and section 1050.8 of the Transit Rules of Conduct) rather than the truth of the matter asserted (that Corso in fact violated those statutes).

do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (internal quotation marks omitted). "[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Id. at 77. Further, "[t]he pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." Lopez v. City of New York, 901 F. Supp. 684, 691 (S.D.N.Y. 1995) (citing PSI Metals v. Firemen's Ins. Co. of Newark, 839 F.2d 42 (2d Cir. 1988)); see Dowd v. DeMarco, No. 17 Civ. 8924 (SHS), 2018 WL 2926619, at *6 (S.D.N.Y. June 12, 2018) (citing Lopez); De Santis v. City of New York, No. 10 Civ. 3508 (NRB), 2011 WL 4005331, at *8 (S.D.N.Y. Aug. 29, 2011) (same); Bernstein v. City of New York, No. 06 Civ. 895 (RMB), 2007 WL 1573910, at *7 (S.D.N.Y. May 24, 2007) (same).

"[C]ollateral objectives typically associated with abuse of criminal process are extortion, blackmail, or retribution; and those objectives are usually characterized by personal animus." Jovanovic v. City of New York, No. 04 Civ. 8437 (PAC), 2010 WL 8500283, at *9 (S.D.N.Y. Sept. 28, 2010), aff'd, 486 F. App'x 149

(2d Cir. 2012). Nonetheless, "courts have found malicious abuse of process claims to be properly based on such improper purposes as a desire to safeguard one's employment, a desire to escape blame for allowing a suspect to go free, or a desire to intimidate or embarrass plaintiff." O'Brien v. City of Yonkers, No. 07 Civ. 3974 (KMK), 2013 WL 1234966, at *17 (S.D.N.Y. Mar. 22, 2013) (citations omitted); see also Jovanovic, 2010 WL 8500283, at *9 ("[C]ourts have held that protecting one's employment could be an objective sufficient to establish the collateral objective element of a malicious abuse of process claim." (citing Hernandez v. Wells, No. 01 Civ. 4376 (MBM), 2003 WL 22771982, at *9 (S.D.N.Y. Nov. 24, 2003))).

Corso alleges that the officers arrested Corso in order to pursue two collateral purposes: (1) "to enforce the City of New York's illegal policy of arresting persons with knives under the pretense of possession of a gravity knife" and (2) "to cover up their unlawful stop and search of Mr. Corso." Compl. ¶ 62. The wholly conclusory nature of this allegation -- the only part of the complaint relating to the officers' collateral objectives -- is sufficient to warrant dismissal of this claim. See Bernstein, 2007 WL 1573910, at *7 (S.D.N.Y. May 24, 2007) ("The Amended Complaint, however, fails to offer any allegations identifying any non-speculative, non-conclusory collateral objective sought to be achieved through Plaintiff's arrest and prosecution."); Jovanovic

v. City of New York, No. 04 Civ. 8437 (PAC), 2006 WL 2411541, at
*12 (S.D.N.Y. Aug. 17, 2006) ("Plaintiff alleges a collateral
objective only in the most conclusory fashion, failing to provide
any basis for assessing [the officer's] motive for the arrest.").

But even if the complaint had offered more fulsome allegations
addressing the officers' collateral purposes, the two identified
in the complaint would be insufficient.  First, enforcement of the
City's policy of arresting persons with knives other than gravity
knives is not a cognizable collateral objective for two reasons.
As an initial matter, it is not an objective "outside the
legitimate ends of the process" that is "beyond or in addition to
[the plaintiff's] criminal prosecution."  Savino, 331 F.3d at 77
(emphasis added).  Rather, the policy that Corso alleges seeks the
arrest and prosecution of individuals carrying knives (regardless
of whether they are gravity knives or knives other than gravity
knives), which are precisely the ends sought by the process; to
the extent Corso finds fault in the City's alleged policy, the
proper avenue for relief is a Monell claim against the City (which
he does assert) and not an abuse-of-process claim.  Second, the
objective of enforcing the City's policy of arresting individuals
was satisfied when the officers arrested Corso.  The officers'
"pursuit of [this] collateral objective" could not have occurred
"after the process [was] issued" because the issuance of process
postdated achievement of the objective in question.  Lopez, 901 F.

Supp. at 691. The enforcement of the City's alleged policy to arrest individuals with knives, therefore, is not a collateral objective that can support Corso's malicious abuse of process claim.

The second collateral objective that Corso identifies -- the officers' desire to cover up their initial stop and search -- is also insufficient. Protecting one's job security or reputation may be cognizable collateral objectives, but the complaint contains no allegations suggesting that the officers' jobs would be at risk if they were to stop and search an individual in violation of the Fourth Amendment or that their reputation would suffer.[19] Indeed, given the complaint's emphasis on the City's alleged "policy of arresting persons with knives under the pretense of possession of a gravity knife," Compl. ¶ 62, it is wholly implausible that Calle-Palomeque and Doe's job security would be jeopardized or that their reputation would be tarnished by their acting pursuant to that policy (i.e., their following orders), even if doing so requires (as Corso alleges) unconstitutional stops and searches.

Corso's malicious abuse of process claim is dismissed. To the extent probable cause existed for Corso's arrest, the

_____

[19] In Hernandez, for example, the officer "had been told that he would be fired if he violated any rules or regulations at any time in the future" and therefore fabricated an incident to justify his actions, 2003 WL 22771982, at *9. The complaint makes no comparable allegations here that render plausible the officers' pursuit of such an objective.

individual defendants are entitled to qualified immunity. But even if probable cause was lacking, Corso has not sufficiently alleged the officers' pursuit of a collateral objective. Their enforcement of the City's alleged policy of arresting individuals with non-gravity knives is not a collateral objective outside the legitimate ends of the process pursued after that process was issued, and the complaint does not plausibly allege that the officers sought to protect their employment or reputations by subjecting Corso to legal process.[20]

### E.   Failure to Intervene (Claim 5)

"A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to [deprivations of constitutional rights], and may be held liable for his failure to do so if he observes the [other officers' actions] and has sufficient time to act to prevent it." Figueroa v. Mazza, 825 F.3d 89, 106 (2d Cir. 2016). "A police officer may be liable for failure to intervene under § 1983 where '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'" Rodriguez

---

[20] While not critical to our analysis, Corso plainly errs as a matter of law in contending that probable cause is not dispositive of a claim for malicious abuse of process. The existence of probable cause entitles an officer to qualified immunity against such a claim. See Mangino v. Incorporated Village of Patchogue, 808 F.3d 951, 958-59 (2d Cir. 2015) (discussing Weiss v. Hunna, 312 F.2d 711 (2d Cir. 1963), and subsequent authorities).

v. City of New York, No. 17 Civ. 12 (KBF), 2018 WL 2371719, at *4 (S.D.N.Y. May 24, 2018) (quoting Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), aff'd sub nom. Jean-Laurent v. Wilkerson, 461 F. App'x 18 (2d Cir. 2012)); see Anderson v. City of New York, No. 15 Civ. 6246 (AJN), 2017 WL 4712790, at *7 (S.D.N.Y. Sept. 25, 2017) (same); Alicea v. City of New York, No. 13 Civ. 7073 (JGK), 2016 WL 2343862, at *7 (S.D.N.Y. May 3, 2016) (same). Axiomatically, then, an officer cannot be liable for failure to intervene (1) if she directly inflicts the constitutional harm or (2) if no constitutional violation has occurred as a threshold matter.

A failure to intervene claim will also fail if the officer is entitled to qualified immunity. See Grice v. McVeigh, 873 F.3d 162, 169 (2d Cir. 2017) (dismissing failure to intervene claim based on qualified immunity); Ricciuti, 124 F.3d at 129 ("To recover [based on failure to intervene], a plaintiff must still overcome the hurdle of qualified immunity."). "A police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known." Ricciuti, 124 F.3d at 129 (internal quotation marks omitted).

Because we have concluded that the individual officers are entitled to qualified immunity on Corso's false arrest claim, his

failure-to-intervene claim is dismissed to the extent it is based on his arrest.  Similarly, because Corso fails to adequately plead his fair-trial and abuse-of-process claims, this claim is also dismissed to the extent it is based on those claims.

Therefore, this claim could survive only to the extent it is based on the initial stop and search.  While we recognize that Corso generally pleads that the actions in question were undertaken by the "officers" or "individual defendants," e.g., Compl. ¶¶ 23-25, 33, 39-44, and that this lack of specificity undermines the general plausibility of Corso's allegations, a plaintiff may assert both direct claims and failure to intervene claims against the same defendant even though such claims are inconsistent, see, e.g., Polanco, 2018 WL 1804702, at *9-10.

Here, however, Corso only pleads (again in cursory fashion) that "[t]hose individual defendants that were present but did not actively participate in the . . . unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene." Compl. ¶ 67.  A conclusory allegation of this type does not plausibly allege that either officer was not directly involved in causing the constitutional harm or that that officer had an opportunity to intervene.  To the contrary, the complaint strongly suggests that an officer would not have had a reasonable opportunity to intervene before Corso's stop, as Corso alleges he

was stopped immediately "[u]pon exiting from the train onto the platform," Compl. ¶ 20. Given the immediacy with which Corso was stopped by (at least) one of the officers, it becomes implausible that the other officer (to the extent either did not directly participate) would have had "a realistic opportunity to intervene," Jean-Laurent, 540 F. Supp. 2d at 512, prior to the allegedly unconstitutional stop and search. Corso's failure-to-intervene is therefore dismissed in its entirety.[21]

### F. Municipal Liability under Monell (Claim 6)

To state a claim for municipal liability under Monell, a plaintiff is required to allege (1) a municipal custom, policy, usage, or practice that (2) is the "moving force" behind the constitutional violation that he experiences. See Cash v. County of Erie, 654 F.3d 324, 333-34 (2d Cir. 2011); see also Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007).

"A plaintiff may satisfy the 'custom, policy, or usage' requirement in one of four ways. The plaintiff may [allege] (1) a formal policy which is officially endorsed by the municipality, (2) actions taken or decisions made by municipal officials with final decision-making authority, (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of policymaking officials, or

---

[21] To the extent Corso may amend his complaint to sufficiently plead his fair-trial claim, doing so may also resuscitate his failure-to-intervene claim to the extent it is based on the underlying fair-trial claim.

(4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees." Soba v. N.Y.C. Hous. Auth., No. 11 Civ. 7430 (NRB), 2013 WL 3455449, at *5 (S.D.N.Y. July 9, 2013) (internal quotation marks omitted); see Robinson v. Town of Kent, 835 F. Supp. 2d 1, 8 (S.D.N.Y. 2011); see also, e.g., Castilla v. City of New York, No. 09 Civ. 5446 (SHS), 2012 WL 5510910, at *4 (S.D.N.Y. Nov. 14, 2012) (identifying the same four theories of Monell liability); Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (same). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012).

The policy must also be the "moving force" behind the constitutional violation. That is, there must be "a direct causal link between the municipal policy or custom and the alleged constitutional deprivation." Outlaw v. City of Hartford, 884 F.3d 351, 373 (2d Cir. 2018) (internal quotation marks omitted). The concept of "'proximate cause,' although derived from tort law, fairly describes a plaintiff's causation burden with respect to a municipal liability claim under § 1983." Cash, 654 F.3d at 342.

Here, Corso offers a number of theories for why the City should itself be liable:

(a) explicitly and/or implicitly establishing a policy of falsely arresting individuals who possess legal utility knives in order to intimidate and harass individuals who carry them; (b) making arrests without probable cause or any legal basis in order to promulgate the City of New York's deliberately flawed interpretation of a gravity knife; (c) showing deliberate indifference to whether the arrests made pursuant to that were made based on probable cause or with the proper application of the New York Penal Law; (d) showing deliberate indifference to the training of subordinate officers to not arrest individuals unless they are arrested upon probable cause or a basis under the law in accordance with the proper standards under the New York Penal Law; (e) showing deliberate indifference to training officers as to the difference between gravity and nongravity knives; (f) having no check or balance in place to verify the legality of these knives; (g) showing deliberate indifference to the supervision of subordinate officers in the NYPD for the arrests in determining whether the alleged "gravity knives" were legitimate; (h) making the aforementioned arrests notwithstanding clearly established law prohibiting them; (i) specifically instructing officers on using an improper test or manner to check the functionality of a knife that specifically includes legal folding knives within the definition of gravity knives; (j) utilizing an improper test or manner to check the functionality of a knife that specifically includes legal folding knives within the definition of gravity knives; (k) failing to properly instruct and educate officers regarding the proper definition of centrifugal force; and (*l*) City of New York policymakers continued constructive acquiescence to repeated and continuing constitutional violations of individuals who are being illegally arrested and prosecuted.

Compl. ¶ 93.

But this multiplicity of theories is accompanied by a paucity of factual allegations. See Montero v. City of Yonkers, 890 F.3d 386, 403-04 (2d Cir. 2018) ("[T]he mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least

circumstantially, such an inference." (omission in original) (quoting <u>Dwares v. City of New York</u>, 985 F.2d 94, 100 (2d Cir. 1993))). Corso alleges the following facts in support of his <u>Monell</u> claim: (1) that several courts have held that a visible knife clip or the visible outline of a knife do not give officers reasonable suspicion to conduct a stop, Compl. ¶¶ 76, 79; (2) that the NYPD arrested 70,000 people between 2000 and 2012 for violating certain sections of the Penal Law pertaining to weapons possession and that approximately two-thirds of these arrests related to gravity-knife possession, Compl. ¶ 78; (3) that the City has "perpetuated thousands of false arrests, detentions, and prosecutions, for possession of instruments alleged to be gravity knives [that] in reality are not gravity knives," Compl. ¶ 82;[22] and (4) that the number of arrests for violating section 265.05(1) of the Penal Law has increased substantially between 2006 and 2008, stabilizing at approximately 7,000 arrests per year since 2009, Compl. ¶ 84.

To the extent Corso asserts theories based on formal policies adopted by the City or actions taken by municipal officials (the first two ways of satisfying the "custom, policy, or usage" requirement), the four cases and the myriad statistics he cites

---

[22] Corso further alleges that because such knives are not gravity knives, they "are therefore not illegal in any respect," Compl. ¶ 82, but this portion of the allegation is a legal conclusion that is properly disregarded even if it were not one of questionable correctness. Gravity knives are not the only knives that can be illegal under the Penal Law, the Transit Rules of Conduct, or the City Administrative Code.

are insufficient to plausibly suggest the existence of a formal City policy of any type, see Monell, 436 U.S. at 690 (referring to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers"),[23] or the taking of explicit actions by City officials with policymaking authority as analyzed under New York state law, see Jeffes v. Barnes, 208 F.3d 49, 57-58 (2d Cir. 2000) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123-25 (1988) (plurality opinion)). Therefore, Corso may rely only on the third and fourth methods of pleading Monell liability: a practice so persistent and widespread that policymaking officials may be charged with constructive notice, or a failure to train or supervise subordinates amounting to deliberate indifference.

Corso's Monell claim is dismissed to the extent it argues that the City has failed to properly train or supervise its officers on how to distinguish gravity knives from other knives. As the complaint alleges, the officers attempted to open Corso's knife using only gravity and centrifugal force. Compl. ¶ 33. That

---

[23] Corso's recharacterization of the City's argument that a reasonable officer could have believed that Corso's knife was illegal under section 1050.8 of the Transit Rules of Conduct into a purported concession that the City has a "belief that any knife satisfies the definition of a gravity knife and probable cause to arrest" [Opp'n at 21] that satisfies Monell's custom, usage, or policy requirement is nonsensical at least thrice over. First, the City's statement relates to the specific knife that the complaint alleges that Corso was carrying -- one with a 3.25-inch blade -- not all knives. Second, the City's belief as to the scope of section 1050.8 is not a custom, usage, policy, or practice unless it is regularly acted upon, in which case those regular actions would be the custom, usage, or practice. Third, section 1050.8 proscribes the carrying of all "weapons" and "dangerous instruments," not only gravity knives, as Corso himself appears to concede.

is, they attempted to apply the wrist-flick test -- the means of distinguishing gravity knives from other knives that has recently withstood constitutional challenge, <u>see generally</u> <u>Copeland v. Vance</u>, 893 F.3d 101 (2d Cir. 2018), and were initially unable to do so. The further allegation that Calle-Palomeque then manipulated the knife so that it would open using only centrifugal force, Compl. ¶ 37, does not support an inference that officers are insufficiently trained; rather, it supports the inference that Calle-Palomeque was sufficiently trained to know the difference between gravity knives (openable using the wrist-flick test) and non-gravity knives and deliberately manipulated Corso's knife from the latter type to the former.

The remainder of Corso's theories of <u>Monell</u> liability contend that the City has policies, practices, or customs relating to its interpretation and enforcement of section 265.01 of the Penal Law.[24] The statistics alleged in the complaint, relating to the number of arrests in recent years for violations of the weapons-possession sections of the Penal Law, Compl. ¶¶ 78, 82, 84, and the existence of a number of prior cases addressing arrests for alleged gravity-knife possession, Compl. ¶¶ 76, 79, might well support a plausible inference that the City's practices and customs regarding the treatment of knives under the Penal Law are so

---

[24] Notably, Corso limits his theories of municipal liability to false arrests and not unlawful stops and searches.

persistent and widespread that policymaking officials may be charged with constructive notice.

But even if so, the complaint does not allege any policies, practices, usages, or customs relating to section 1050.8 of the Transit Rules of Conduct, and therefore does not plausibly allege that the City's practices and customs regarding enforcement of section 265.01 of the Penal Law were a "moving force" behind Corso's constitutional deprivations. The complaint supports no inference that Corso would not have been arrested for violating section 1050.8 of the Transit Rules of Conduct even if the City did not have any allegedly problematic practices and customs regarding enforcement of section 265.01. Cf. Compl. ¶ 38 (noting that the officers contended that "Corso had violated New York Penal Law § 265.01(1) . . . and New York Transit Rules of Conduct § 1050.8"). In turn, the problematic practices and customs that Corso alleges would not be a but-for cause of, let alone the moving force behind, Corso's arrest. Corso's Monell claim is therefore dismissed in its entirety.

## III. Conclusion

Whatever the wisdom of section 265.01 of the Penal Law, section 1050.8 of the Transit Rules of Conduct, and the City of New York's enforcement policies regarding gravity knives, we are concerned here solely with whether the complaint sufficiently alleges that Matthew Corso's constitutional rights were violated

and, if so, whether any of the defendants can be held liable in damages under 42 U.S.C. § 1983. Because the answers to those questions generally are no, defendants' motion to dismiss is granted in large part. The motion is granted as to Corso's false arrest, denial of a fair trial, malicious abuse of process, failure to intervene, and Monell claims. The motion is denied as to his unlawful stop and search claim because Corso's complaint lacks the factual detail necessary to fully assess defendants' reasonable suspicion and qualified immunity arguments.

Corso is granted leave to amend, limited to the fair-trial claim (and the failure to intervene claim to the extent it is based on the fair-trial claim). An amended complaint shall be filed, with an attached redline reflecting any amendments, within 21 days of the date of this Memorandum and Order. The Clerk of the Court is directed to terminate the motion pending at docket entry 12.

**SO ORDERED.**

Dated:    New York, New York
          September 20, 2018

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

40